**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **SUNPRO, INC.,** ) | **CASE NO. 5:12CV409** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **MAGISTRATE JUDGE** |
| ) | **GEORGE J. LIMBERT** |
| ) | |
| **RICE DRILLING B. LLC., et al.** ) | |
| ) | **MEMORANDUM OPINION & ORDER** |
| **Defendant.** ) | |

This matter is before the Court on a motion for partial judgment on the pleadings filed on behalf of Plaintiff/Counterclaim-Defendant, Sunpro, Inc. on September 7, 2012 ("Sunpro"). ECF Dkt. #37. On October 10, 2012, Defendants/Counterclaim Plaintiffs Rice Drilling B. LLC. ("Rice") and Alpha Shale Resources, LP ("Alpha Shale") filed an opposition brief. ECF Dkt. #38. On October 18, 2012, Sunpro filed its reply brief. ECF Dkt. #39.

For the following reasons, the Court GRANTS Sunpro's motion for partial judgment on the pleadings (ECF Dkt. #37) and DISMISSES WITH PREJUDICE Rice and Alpha Shale's counterclaims of breach of contract and unjust enrichment/quantum meruit against Sunpro.

**I.     RELEVANT FACTUAL AND PROCEDURAL HISTORY**

On May 31, 2012, Sunpro filed its first amended complaint against Rice alleging that it had entered into contracts with Rice to provide miscellaneous services for Rice's oil and gas well operations. ECF Dkt. #25 at 177.[1] Sunpro avers that the Master Service Agreement ("MSA") designated it as a non-exclusive contractor on Rice's approved list of contractors that could provide work for Rice's oil and gas well operations. *Id*. Sunpro alleges that it provided Rice with the "Rice Energy Response Services Rates" Schedule ("Schedule") either during or shortly after the execution of the MSA which contained the rates for the services that Sunpro would provide to Rice along with

---

[1] Page numbers in this Memorandum Opinion & Order refer to the Page ID# in the electronic filing system.

markups and service charges. *Id*. at 178. Sunpro avers that it provided the Schedule prior to performing any work for Rice. *Id*.

Sunpro further alleged that it began performing services and hired subcontractors to perform work for Rice and "from 2010 until approximately Fall of 2011, Defendant Rice paid Plaintiff Sunpro for the services that Plaintiff Sunpro was providing, and these payments were being made in accordance with the Rates Schedule." ECF Dkt. #25 at 178. Sunpro avers that thereafter, two of its employees, Glenn King and Mike Lauderbaugh, who worked most closely with Rice, resigned with Sunpro and became employed by Rice and/or one of its affiliates. *Id.* Sunpro states that shortly thereafter, Rice's CEO told Sunpro that Rice was using Glenn King to review Sunpro's invoices, which was a direct violation of King's employment contract with Sunpro. *Id*. Rice thereafter stopped paying Sunpro for any services that it provided to Rice, yet continued to contract with Sunpro for services and failed to renegotiate rates different from those provided in the Schedule. *Id*. at 179.

Sunpro alleges that Rice owes it $4,184.458.04 in principal, plus interest, as well as punitive damages, attorney fees, and costs. ECF Dkt. #25 at 179. Sunpro brings causes of action against Rice for:

1. Breach of Contract for Rice's alleged stopping of all payments under the MSA even though the parties continued to perform in accordance with the MSA and the Schedule until the Fall of 2011;

2. Breach of Duty of Good Faith for Rice allegedly inducing or improperly influencing one or more of Sunpro's ex-employees to breach their employment contracts with Sunpro and provide confidential trade secret information to make unwarranted claims about improper invoicing by Sunpro on prior payments and stopping payment on other outstanding invoices;

3. Quantum Meruit/Unjust Enrichment as Sunpro expended substantial labor and resources at Rice's request for its oil and gas operations from June 16, 2010 through February 13, 2012, with Rice receiving the benefit of those services, but allegedly failing to pay on all invoices submitted for those services; and

4. Intentional Interference with Contract as Rice allegedly knew that Sunpro had contractual relationships with Glenn King and Mike Lauderbaugh that included confidentiality expectations and had these former employees review the Schedule with Rice to divulge Sunpro's confidential trade secret materials related to business profit margins, pricing strategies, and other confidential information.

*Id*. at 179-183.

On June 18, 2012, Rice filed an answer to the amended complaint indicating that a MSA existed between the parties whereby Sunpro agreed to provide services to Rice for its oil and gas operations. ECF Dkt. #26 at 208. Rice avers that the MSA did not set forth the rates or charges for the services, but the parties understood that Sunpro would invoice and Rice would pay rates and charges that were commercially reasonable and consistent with the prevailing rates for the services. *Id.* at 208-209. Rice alleges that Sunpro provided the Schedule one month after the execution of the MSA and "[w]hen it received a copy of the Rate Sheet, Rice has no reason to believe that the rates and charges set forth on that sheet were not commercially reasonable and not consistent with the prevailing market rates in the oil and gas industry for those services." *Id.* at 209.

Rice indicates that from June 2010 through October 2011, Sunpro provided services in accordance with the MSA and submitted invoices with rates and charges that were "(in many instances)" consistent with the Schedule and Rice those invoices. ECF Dkt. #26 at 209. Rice avers that in September 2011, it first realized that the Sunpro invoices were not commercially reasonable and were "(in many instances)" far greater than the prevailing rates. *Id.* Rice states that Sunpro's failure to advise Rice of its desire to use subcontractors and to obtain Rice's prior written approval to do so, which was required under the MSA, prevented Rice from discovering the overbilling at an earlier time. *Id*.

Rice further avers that Sunpro stopped paying its subcontractor Patriot Water Treatment, LLC ("Patriot") who sued Sunpro for breach of contract and included claims against Rice for unjust enrichment, and Rice subsequently paid Patriot $431,341.20, even though Sunpro had the obligation to pay Patriot. ECF Dkt. #26 at 210. Rice also alleges that it received a phone call from Jeffrey Grecoe, a landowner, who received a document from Sunpro entitled "Subcontractors Formal Notice of Intention to File a Mechanic's Lien Claim" and Grecoe told Rice that when he asked Sunpro why he had received this document, he was told that "Rice doesn't pay its bills so we are going to put a mechanic's lien on your property." *Id*. at 210-211. Rice alleges that another Sunpro representative also made a statement to Patriot indicating that Rice does not pay its bills.

-3-

In its counterclaim, Rice sues Sunpro for:

1. Breach of the MSA Contract, alleging that Sunpro was "charging, in bad faith, rates that were not commercially reasonable and were (in many instances) far greater than the prevailing market rates in the oil and gas industry for those services."

2. Unjust Enrichment/Quantum Meruit to recover overpayments Rice made to Sunpro from August 2010 through October 2011 for services rendered by Sunpro to Rice that were based upon excessive rates charged by Sunpro without Rice's knowledge;

3. Defamation by Implication for alleged statements by Sunpro to Mr. Grecoe and to Patriot that "Rice doesn't pay its bills" without telling Mr. Grecoe and Patriot that a dispute existed about the amounts Rice owed and Rice's belief that it was due a refund due to overpayments.

*Id.* at 211-214.

On June 25, 2012, Sunpro filed an answer to Rice's counterclaim. ECF Dkt. #27.

On July 31, 2012, with Court permission, Sunpro filed a second amended complaint adding new party Defendant Alpha Shale. ECF Dkt. #30. Sunpro alleges that Alpha Shale is in a joint venture with Rice and Alpha Shale alleges that Sunpro entered into a MSA with it on October 4, 2010. *Id*. at 230. Sunpro avers that this MSA "purports to be signed by Glenn King on behalf of Sunpro, but the principals of Sunpro were not aware of this written agreement." *Id.* Sunpro thereafter repeats its allegations from its first amended complaint, and alleges that it provided Rice with the Schedule upon execution of or very soon after the execution of the MSA and began performing services and "no rates schedule or pricing other than the Rates Schedule was ever provided by Plaintiff Sunpro to either Defendant Rice or Defendant Alpha." *Id*. Sunpro further avers that either Rice or Alpha Shale initially paid its invoices for services rendered and thereafter began employing Glenn King and Mike Louderbaugh, who worked most closely with Rice during this time period. *Id.* at 231. Sunpro advances causes of action against Alpha Shale for breach of contract for stopping all payments for services rendered, breach of the duty of good faith by inducing or improperly influencing King and Louderbaugh to breach Sunpro's employment contract and provide Sunpro's confidential pricing and markup information to Rice, quantum meruit/unjust enrichment, and intentional interference with contract by being in a joint venture with Rice who had

Sunpro's former employees review the invoices to divulge Sunpro's confidential trade secret materials related to business profit margins, pricing strategies, and other information. *Id.* at 232-236.

On August 17, 2012, Rice and Alpha Shale filed an answer to the second amended complaint. Rice and Alpha Shale admitted that Alpha Shale is a joint venture and one of Rice's affiliates is a member in Alpha Shale and they entered into arrangements with various contractors, including Sunpro to provide services for their oil and gas operations. ECF Dkt. #32 at 258-259. Rice and Alpha Shale also admitted that an exhibit provided by Sunpro of a MSA between Sunpro and Alpha Shale signed in October 2010 was the MSA and Glenn King signed this agreement and the Rice MSA on behalf of Sunpro. *Id*. at 259. Rice and Alpha Shale further admitted that they paid Sunpro's invoices from 2010 through the Fall of 2011 under the belief that the invoices reflected reasonable rates under the Rice MSA and the Alpha Shale MSA and stopped payments, they aver, when they realized the rates were not commercially reasonable. *Id.* at 260-261. Rice and Alpha Shale also aver that the Schedule was not provided to Alpha Shale, was not signed by Alpha Shale and is not part of the contract between Sunpro and Alpha Shale. *Id.* at 267.

Rice and Alpha Shale reiterated Rice's counterclaim against Sunpro, but added averments that Rice and Alpha Shale are not joint venture partners as Rice's affiliate owns a 49.95% membership interest in Alpha Shale and the operations of Alpha Shale are separate and distinct from those of Rice. ECF Dkt. #32 at 268. The Rice and Alpha Shale counterclaims were the same that Rice had advanced in its first counterclaim: breach of contract against Sunpro for charging in bad faith rates that were not commercially reasonable; unjust enrichment/quantum meruit on alleged overpayments for overcharges by Sunpro; and defamation by implication for statements allegedly made by Sunpro representatives that Rice doe not pay its bills. *Id.* at 271-275.

On August 27, 2012, Sunpro filed an answer to Rice and Alpha Shale's counterclaim. ECF Dkt. #34.

On September 7, 2012, Sunpro filed the instant motion for partial judgment on the pleadings. ECF Dkt. #37. On October 10, 2012, Rice and Alpha Shale filed a brief in opposition to the motion. ECF Dkt. #38. On October 18, 2012, Sunpro filed a reply. ECF Dkt. #39.

## II. STANDARD OF REVIEW

Federal Civil Rule 12(c) provides that "[a]fter the pleadings are closed -- but early enough not to delay the trial --a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A court reviews a Rule 12(c) motion for judgment on the pleadings under the same standard as a motion to dismiss under Rule 12(b)(6). *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

Thus, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012), quoting *JPMorgan Chase Bank, N.A., v. Winget*, 510 F.3d 577, 581 (6th Cir.2007). Although a complaint need not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Thus, a complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). And, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir.2009) (quoting *Iqbal*, 129 S.Ct. at 1949).

## III. LAW AND ANALYSIS

Sunpro contends that the Court should dismiss Rice and Alpha Shale's counterclaims of breach of contract and unjust enrichment/quantum meruit because their voluntary payment of Sunpro's invoices defeats the claims of any alleged overpayments. ECF Dkt. #37 at 312. Rice and Alpha Shale contend that the voluntary payment doctrine does not apply when the paying party lacks or is mistaken about the material facts and they were mistaken as to the excessiveness of Sunpro's rates. ECF Dkt. #38 at 317.

-6-

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Miller v. State Farm Mutual Automobile Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). Accordingly, this Court looks to Ohio choice of law principles in order to determine the applicable state law. The Ohio Supreme Court has adopted the Restatement (Second) of Conflict of Laws, which provides that courts should enforce choice-of-law provisions upon which the parties agree, unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or the chosen state law would be contrary to a fundamental policy of a state which has a materially greater interest in the particular issue. *Girgis v. Countrywide Home Loans, Inc.*, 733 F.Supp2d 835, 851 (N.D. Ohio 2010), quoting *Tele–Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir.1987) (quoting *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 6 Ohio St.3d 436, 438–39, 453 N.E.2d 683 (1983)).

Here, both parties appear to agree that the law of the Commonwealth of Pennsylvania applies as the MSA governing the relationship contains a provision indicating as much. ECF Dkt. #30-1 at 240; ECF Dkt. #30-2 at 243; ECF Dkt. #37 at 312 (indicating MSA requires that Pennsylvania law applies; ECF Dkt. #38 at 321-324 (citing only Pennsylvania law). Further, the Court finds that Pennsylvania has a substantial relationship to the parties and the transaction since Rice and Alpha Shale are located in Pennsylvania and engage in oil and gas well drilling operations in Pennsylvania, the MSA indicated that Pennsylvania law would govern, and Pennsylvania law would not be contrary to the fundamental policy of any other state with a materially greater interest in this dispute.

Sunpro contends that under Pennsylvania law, the voluntary payment doctrine bars Rice and Alpha Shale's breach of contract and unjust enrichment/quantum meruit claims because they knew Sunpro's charges based upon the invoices that were given to them, and they evaluated and voluntarily paid those invoices. ECF Dkt. #37 at 312. Sunpro asserts that Rice and Alpha Shale's counterclaims do not allege that they made a mistake of fact or that Sunpro perpetrated a fraud on or coerced the sophisticated business entities and therefore, their voluntary payment of the invoices precludes any recovery on these two claims. *Id.* at 313-314.

Rice and Alpha Shale counter that the voluntary payment doctrine does not apply in this case because they, as the paying parties, were mistaken about the material facts "underlying the amounts that Sunpro was charging for its services." ECF Dkt. #38 at 324. Rice and Alpha Shale contend that a mistake of fact existed as to the "then-existing market price" for Sunpro's services as they were unaware that Sunpro had hired subcontractors, in violation of the MSA without their written permission and approval, and omitted those fees from the invoices that Sunpro remitted to them which would have identified Sunpro's markups of their charges. *Id*. at 324-325. Rice and Alpha Shale conclude: "[s]imply stated, Defendants did not overpay Sunpro because they misinterpreted the Rice MSA or the Alpha MSA. Defendants overpaid because — as a result of Sunpro's failure to disclose facts associated with its use of subcontractors, in breach of those contracts — Defendants were unaware of the then-existing market prices for their services." *Id*. at 325. Rice and Alpha Shale assert that their payments to Sunpro were thus not voluntary. *Id*.

The voluntary payment doctrine under Pennsylvania law provides that "one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him...cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law*." Liss & Marion, P.C. v. Recordex Acquisition Corp*., 603 Pa. 198, 983 A.2d 652 (2009), quoting *In re Kennedy's Estate*, 321 Pa. 225, 183 A. 798, 802 (1936). The parties agree that Pennsylvania's voluntary payment doctrine defense can be used when the opposing party seeks recovery due to a mistake of law, but cannot be used when recovery is sought due to a mistake of fact. ECF Dkt. #37 at 313, citing *Coregis Ins. Co. v. Law Offices of Carole F. Karfrissen, P.C.*, 140 F.Supp.2d 461, 463-464 (E.D. Pa. 2001)("[e]xceptions to the [voluntary payment] doctrine, none of which are applicable in this matter, arise only when the claimant alleges a mistake of fact or duress."); ECF Dkt. #38 at 322, quoting *Liss*, 937 A.2d at 514 ("The voluntary payment defense...is inapplicable when money is paid by a person without 'full knowledge of the facts.'" (internal citation omitted)). However, the parties disagree as to whether any alleged mistake made by Rice and Alpha Shale was one of law or of fact.

In asserting that Rice and Alpha Shale's allegations are those of a mistake of law, Sunpro asserts that Rice and Alpha Shale, sophisticated business entities, admitted they received a copy of

-8-

the Schedule, they received invoices submitted by Sunpro for services rendered, and they voluntarily paid those invoices. ECF Dkt. #37 at 313-314. Sunpro contends that no fraud or coercion was alleged in Rice and Alpha Shale's counterclaim and the counterclaim allegations present no plausible set of facts or basis upon which Rice and Alpha Shale could recover on their breach of contract or unjust enrichment/quantum meruit claims. *Id*. at 314.

Rice and Alpha Shale cite to *Liss* and *Landay v. Rite Aid*., 40 A.3d 1280, 2012 PA Super 73 (Pa. Super. Ct. 2012) as support for finding that their failure to discover that Sunpro was allegedly overcharging them for services on the invoices was a mistake of fact because Sunpro failed to reveal its use of subcontractors and their contracts with subcontractors, which violated the contracts between Sunpro and Rice and Alpha. ECF Dkt. #38 at 323-324. Rice and Alpha contend that:

> they remitted excessive payments based on a mistake of fact regarding the then-existing market price for the services. Defendants were unaware that Sunpro had subcontracted the services for much lower prices, and the imposed charges far in excessive[sic] of the then-existing prices. In fact, Sunpro deliberately concealed its overcharges by (1) failing to obtain Defendants' approval prior to utilizing a particular subcontractor in accordance with the contracts, which process would have disclosed the subcontractors' rates, and (2) omitted the subcontractors' fees from the invoices that Sunpro remitted, which would have identified Sunpro's markup.

*Id*. at 324-325.

In *Liss*, a law firm brought a class action on behalf of medical record requesters for breach of contract alleging that the copy service providers of the medical records charged rates for copies of electronic records that exceeded those authorized by the Medical Records Act. 983 A.2d at 656. The copy service asserted that the voluntary payment doctrine barred the breach of contract claims because the class action litigants accepted the higher charges without complaint and should have been aware of the pricing limitations in the Medical Records Act. *Id.* The Supreme Court of Pennsylvania held that the voluntary payment defense did not apply because the copy service misrepresented in its invoices that the source of copies were from microfilm, for which the Medical Records Act allowed a higher rate, when the source of the copies were actually from electronic records. *Id.* at 661-662. The court held that a mistake of fact and not a mistake of law occurred because the class action litigants did not know when they paid the higher rate that they were paying for copies from electronic records and not microfilm records as the bills had represented. *Id.*

-9-

In *Landay*, record requesters brought a class action against the pharmacy, asserting that the pharmacy overcharged them and breached the part of their contracts containing the Medical Records Act's price limitations by charging a flat $50.00 copy fee for reproducing pharmacy records that were not related to Rite Aid's actual costs for searching for, retrieving and reproducing and transmitting the pharmacy records. 40 A.3d at 1288-1289. Rite Aid asserted that the requesters approved and voluntarily paid the flat fee and thus the voluntary payment doctrine barred their breach of contract action. *Id*. The Superior Court of Pennsylvania ruled that the voluntary payment defense did not bar the record requesters' right to recover for breach of contract because the boilerplate language on the invoices and the generic vague terms regarding research and preparation fee did not constitute a payment based upon full knowledge of the facts. *Id.*

The Court finds *Liss* and *Landay* distinguishable from the instant case.  In the former, the Pennsylvania courts focused on the invoices provided by the defendants which were lacking in specific information relevant to the overcharges.  Further, *Liss* and *Landay* dealt with parties who were unequal in sophistication.  In the instant case, Rice and Alpha Shale do not allege that the invoices provided by Sunpro lack specificity or contain misrepresentations regarding the rates or prices charged.  Rather, Rice and Alpha Shale complain that the invoices did not reveal to them Sunpro's markup of prices.  The failure to include subcontractor pricing or the fact that Sunpro had contracted with subcontractors in violation of the MSAs did not prevent or otherwise bar Rice and Alpha Shale from evaluating and discovering whether the rates charged by Sunpro were excessive or higher than the then-prevailing market rates.

The Court finds the instant case more similar to that of the *Acme Markets, Inc. v. Valley View Shopping Center, Inc*. 342 Pa. Super. 567, 493 A.2d 736 (Pa. Super. Ct. 1985), a case cited by Sunpro, than to *Liss* and *Landay*.  In *Acme*, Acme Markets brought suit to recover monies that it had paid to its landlord for maintaining a parking lot and a portion of real estate taxes.  493 A.2d at 737. Acme Markets' predecessor had entered into a lease with Valley View Shopping Center, Inc. for a fifteen year term with options to renew.  *Id*.  The shopping center was conveyed to Valley View Realty in 1975 and the lease with Acme Markets provided that it was to pay maintenance costs and a portion of real estate taxes "during the initial term," which Acme Markets did. *Id*. at 737-738.

After the lease expired on December 31, 1975, Acme Markets continued to occupy the space and continued to pay the maintenance costs and part of the real estate taxes. *Id*. at 738.

The trial court held that Acme Markets' mistake in continuing to make payment beyond the lease term was a mistake of law and therefore Acme Market could not recover the over $70,000 that it had paid. 493 A.2d at 737. The Superior Court of Pennsylvania agreed, finding that a "mistake of law is a mistake 'as to the legal consequences of an assumed state of facts.'" *Id*., quoting *Betta v. Smith*, 368 Pa. 33, 36, 81 A.2d 538, 539 (1951). The Superior Court set forth the relevant Pennsylvania law as follows:

> Where, under a mistake of law, one voluntarily and without fraud or duress pays money to another with full knowledge of the facts, the money paid cannot be recovered. *Ochiuto v. Prudential Insurance Co. of America*, 356 Pa. 382, 384, 52 A.2d 228, 230 (1947). Thus, money paid voluntarily, although under a mistake of law as to the interpretation of a contract, cannot be recovered. *William Sellers & Co. v. Clarke-Harrison, Inc*., 354 Pa. 109, 113, 46 A.2d 497, 499 (1946). It has also been held that "[m]oney cannot be recovered where the payment is pursuant to a uniform practice in construing the contract year after year." *Id.* And, "money, not legally due, but paid voluntarily cannot be recovered back." *Kline v. Morrison*, 353 Pa. 79, 84, 44 A.2d 267, 269 (1945). Accord: *Wilson v. Philadelphia School District*, 328 Pa. 225, 243, 195 A. 90, 100 (1937). The rule disallowing recovery when payments have been made under a mistake of law is supported as a corollary of the criminal law maxim that one is presumed to know the law and that to hold otherwise would render legal accountability unenforceable. 70 C.J.S. *Payment* § 156(a) (1951). It has been suggested that to allow mistake or ignorance of the law to void actions taken by parties would subvert the effective administration of the law. *Id.* Where payment is made under a mistake of fact, however, recovery may be had. *Gilberton Fuels, Inc. v. Philadelphia & Reading Coal & Iron Co.*, 342 Pa. 192, 196, 20 A.2d 217, 219 (1941); *Commonwealth, Department of General Services v. Collingdale Millwork Co.*, 71 Pa.Cmwlth. 286, 293 n. 6, 454 A.2d 1176, 1179 n. 6 (1983).

*Id.* The Superior Court of Pennsylvania held that Acme Markets' mistake was a mistake of law and not a mistake of fact because it was based upon the interpretation of the lease agreement as requiring the payment. *Id.* at 570-571.

Similarly in this case, Rice and Alpha Shale have mistakenly relied upon their interpretation of the MSAs as providing for the reasonableness of Sunpro's rates and how those rates compare to the rates of other providers. However, Rice and Alpha Shale voluntarily paid the invoices each time that they were submitted by Sunpro and they aver in the counterclaim that most of the rates were consistent with the Schedule provided to them by Sunpro. Further, even accepting that Sunpro failed to disclose its use of subcontractors in violation of the MSAs and failed to incorporate the

-11-

subcontractor rates into the invoices which Rice and Alpha Shale paid, the Court sees no basis upon which to find that this acted as a bar to preventing Rice and Alpha Shale from evaluating and comparing the invoice prices to determine if they were reasonable or in line with the-then prevailing market rates before paying them. The Court therefore finds that Rice and Alpha Shale committed a mistake of law and the voluntary payment defense prevents them from recovering for breach of contract and unjust enrichment/quantum meruit.

## IV. CONCLUSION

For these reasons, the Court GRANTS Sunpro's motion for partial judgment on the pleadings (ECF Dkt. #37) and DISMISSES WITH PREJUDICE Rice and Alpha Shale's first and second counts of its Counterclaim for Breach of Contract and Unjust Enrichment/Quantum Meruit.

**IT IS SO ORDERED.**

**SIGNED AND ENTERED** on this 15th day of February, 2013.

*/s/ George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE